## Hulda K. Connor, Administratrix, Appellee, v. American Spirits Mfg. Co., Appellant.

### Gen. No. 5,683.

1. MASTER AND SERVANT—*when instruction erroneous as ignoring assumed risk.* An instruction, to the effect that if the jury find that the death of the deceased was caused by the negligence of the defendant as charged in the declaration while the deceased was in the exercise of ordinary care, they should find the defendant guilty is erroneous as ignoring the question of assumed risk, where there is conflicting evidence as to whether the deceased had spoken to the defendant about the dangerous condition of the premises in that furnace gas which was the alleged cause of his death could not escape from an ash pit, and continued to work in reliance on a promise to remedy the same.

2. INSTRUCTION—*directing verdict.* Where an erroneous instruction directs a verdict it cannot be cured by other instructions stating a different rule.

3. MASTER AND SERVANT—*duty to keep premises safe.* An instruction which by reference to the declaration imposes upon the defendant an absolute duty toward his employer to keep a furnace room in a safe condition is erroneous.

4. MASTER AND SERVANT—*appeal and error.* Errors in the giving of instructions cannot be overlooked where there is a verdict for plaintiff and there is no direct evidence that the alleged wrongful act was the cause of the death of the plaintiff's intestate, and the direct proof tends to show that the death of the deceased was caused by his own negligence.

Action in case for death by wrongful act. Appeal from the Circuit Court of Peoria county; the Hon. LESLIE D. PUTERBAUGH, Judge, presiding. Heard in this court at the April term, 1912. Reversed and remanded. Opinion filed October 15, 1912.

PAGE, WEAD, HUNTER & SCULLY, for appellant; MAYER, MEYER, AUSTRIAN & PLATT, of counsel.

ROBERT H. LOVETT and JOSEPH A. WEIL, for appellee.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

James Connor was an ash handler in the employ of appellant and had been for a number of years. On the night of May 11-12, 1909, he was at work for appellant and was sick and vomited and went home in the morning and his throat and mouth appeared to be burnt and he had medical attendants, who diagnosed his complaint as capillary bronchitis, and he died on May 21, 1909, which death the physicians testified was, or might be, due to the inhalation of gases or vapors. He left surviving him adult married children, not dependent upon him, and his widow, not the mother of his children. She took out letters of administration and brought this suit against appellant for the benefit of the widow and next of kin, and, upon a jury trial, had a verdict, which was reduced in amount, and had a judgment from which defendant below appeals.

In a certain boiler room of appellant were three furnaces in a row, numbers 11, 12 and 13, No. 11 the furthest south and No. 12 the furthest north, and the latter was two feet and ten inches from the north wall of the building. There was a lofty roof above and ventilating places therein above each furnace. For many years the fire box on each furnace was cleaned out from time to time by Connor and others by opening the lower door and pulling the ashes and cinders out in front. Gases and fumes would immediately rise

and, on that account, one man could not do this work alone, but, while one was raking out the ashes and cinders, another man stood by, pouring water upon the hot material as fast as it was drawn out. This water killed the gases or prevented their injuring the men who was drawing them out. Some months before the death of Connor an entirely new system was adopted. A pit, beginning outside the building some six or eight feet south of its south wall, was run directly across underneath each of these furnaces to the north wall of the building. A different method of feeding the furnaces was installed and the ashes and cinders were taken out directly underneath each furnace, by means of what was called a stoker. A certain fastening was struck and a trap door dropped and the ashes and cinders either fell out or were raked out. The instant the workman had struck the fastening of the trap door it was his practice to step back quickly out of the way of the falling ashes and cinders, and they were then wet down with water, appliances for which were at hand at all times. The space above this pit was open, except where covered by the furnaces (which were several feet apart), from the south wall of the building to furnace No. 13, but the space from No. 13 to the north wall was covered and there was no opening there through the wall at the north end of the pit. It seems to have been intended that there should be a track in the pit on which a car should run to receive the ashes and crust, and that there should be an elevator to raise the ashes out of the pit, but these had not yet been put in. There was an opening and ladder way leading down into the pit on each side of each furnace, except that there was none on the north side of No. 13. There was a platform four feet from the floor of the pit, and the ash handlers worked in pairs. One shoveled from the bottom of the pit onto the platform, and the other from the platform to the floor of the furnace room. When one knocked out the fastenings of the trap door in the bottom of the furnace,

it was the duty of the other to stand on the platform or on the floor of the furnace room with hose ready and to pour water upon the fresh ashes and cinders. There was hose both at the top and at the bottom of the pit, and both were ready for instant use when needed, and the men who knocked out the fastening could at once turn on water; and there was proof that deceased had been told to use the water more freely, and that he would some day be injured by the gases if he did not; and there was proof that it was entirely easy to use the water freely and successfully. His associate on the night of May 11-12 was one Smith, who could not be found and whose testimony was not obtained. No witness knew that deceased was injured in the pit that night by inhaling gas. When the trap door was dropped and any crust there may have been in the bottom of the furnace was broken, there was a direct and strong draft from the pit up through the furnace. There was testimony that Connor complained that this did not give sufficient opportunity for the gas to escape which came down under No. 13 and that there was danger of being injured by the gas under that furnace and that he received two or three assurances from his superior that it should be attended to and an opening made in the north wall as soon as the master mechanic could get around to it, but that he was very busy then with certain other work. On the night in question, or near morning, Connor was found outside in the cool air, and was sick and vomiting, and complained that he believed he had inhaled too much gas. It is the claim of appellee that he had inhaled gas, which caused his illness and death. No witness testified to that fact and, if it is established at all, it is only as an inference from circumstances. While the declaration did not state under which furnace he received the gas, nor at which furnace the ventilation was defective, yet each count charged that deceased knew of the dangerous condition and complained to his superior and received a promise to repair from his superior; and there was

no proof of any such complaint and promise except as to No. 13. It would seem to be clear that under the case made by the pleadings and proofs, deceased assumed the risk of any gases from furnaces Nos. 11 and 12. His superior denied that he received any complaint coming from deceased as to the ventilation under No. 13 and denied that he gave any promise to remedy the condition then existing. If deceased knew the danger and did not complain to his superior and received no promise to improve the condition, then apparently deceased also assumed the risk of working under No. 13. There was no proof that he inhaled gas under No. 13 that night, except as the condition of his throat and bronchial tubes tended to show that he inhaled gas, and except the inference that, if he did inhale gas, it would most likely be under the furnace which had the poorest ventilation.

Under these circumstances, we conclude that the giving of the first instruction, requested by appellee, was reversible error. It told the jury that if they believed from the evidence that the death of Connor was caused by the negligence of appellant, as charged in the declaration or some count thereof, while Connor was in the exercise of ordinary care and without fault or negligence on his part, and that he left next of kin surviving him, the jury should find appellant guilty. This instruction ignored the question whether Connor assumed the risk of working there, and it directed a verdict. This was erroneous. Illinois Cent. R. Co. v. Smith, 208 Ill. 608; Illinois Terra Cotta Lumber Co. v. Hanley, 214 Ill. 243. As this instruction directed a verdict, it could not be cured by other instructions stating a different rule. Cantwell v. Harding, 249 Ill. 354, and cases there cited. It could only be supported if the uncontradicted facts showed that he was acting in reliance upon a promise by his superior and did not assume the risk. Here the complaint and promise were denied. The instruction is also incorrect in another respect. Each count of the declaration

charged that the duty of appellant was absolute to maintain said pit in a safe condition and that that duty was violated, whereas the duty of appellant was to exercise reasonable care to keep said pit in a reasonably safe condition, and to exercise reasonable care to furnish deceased a reasonably safe place in which to work.    This instruction, therefore, by its reference to the declaration, imposed upon appellant a greater duty than the law would impose and, under that instruction, and the evidence, the jury might readily find against appellant because it did not maintain the pit in an absolutely safe condition.    It ought also to be stated that there is proof that deceased, who was sixty years old, had been in poor health for some time, and was sick and vomiting before he reached his place of work on the evening of May 11; proof that, during that night, he was lying out of doors on the bank of the Illinois River in a cold north wind; and proof tending to show that he died of pneumonia, and that that may have been produced by his undue exposure that night when overheated.    In view of this testimony and of the absence of any direct proof that he inhaled any gas under No. 13 that night, we feel that the error in giving said instruction cannot be overlooked, but that justice will best be served by another trial.

The judgment is therefore reversed and the cause is remanded.

*Reversed and remanded.*